This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-41069**

**SALLY DYER and MANDI ABERNATHY,**

Plaintiffs-Appellants,

and

**TERESA ROMERO,**

Plaintiff-Cross-Appellee/Cross-Appellant,

v.

**CITY OF ALBUQUERQUE, ex rel.
ALBUQUERQUE POLICE DEPARTMENT,**

Defendant-Appellee/Cross-Appellant/

Cross-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Nancy J. Franchini, District Court Judge**

The Kennedy Law Firm, P.C.
Shannon L. Kennedy
Joseph P. Kennedy
Albuquerque, NM

Youngers Law
Joleen K. Youngers
Santa Fe, NM

for Appellants and Cross-Appellee/Cross-Appellant

City of Albuquerque
Lauren Keefe, City Attorney
Catherine Gonzalez, City Attorney

Albuquerque, NM

Wiggins, Williams & Wiggins, P.C.
Patricia G. Williams
Albuquerque, NM

for Appellee/Cross-Appellant/Cross-Appellee

**MEMORANDUM OPINION**

**BOGARDUS, Judge.**

**{1}**     Plaintiffs Sally Dyer and Mandi Abernathy appeal from the district court's judgment, following a bench trial, in favor of Defendant City of Albuquerque, ex rel. Albuquerque Police Department (the City) on Plaintiffs' claims of retaliation under New Mexico's Whistleblower Protection Act (WPA), NMSA 1978, §§ 10-16C-1 to -6 (2010). The City has filed a cross-appeal seeking reversal of the district court's judgment in favor of Plaintiff Teresa Romero on her claims of discrimination and retaliation under New Mexico's Human Rights Act (NMHRA), NMSA 1978, § 28-1-1 to -15 (1969, as amended through 2024). For the reasons set forth below, we affirm in part and reverse in part.

**BACKGROUND**

**{2}**     Ms. Dyer, Ms. Abernathy, and Ms. Romero are former detectives who worked in the Sexual Crimes Unit (SCU), a specialized unit within the Albuquerque Police Department's (APD) Violent Crimes Division, within the City. The SCU is responsible for the investigation of sex crimes.

**{3}**     All three Plaintiffs filed suit under the WPA alleging that they engaged in protected conduct when they communicated to their employer and third parties about actions or failures to act that they believed in good faith constituted unlawful or improper acts regarding the City's operation of the SCU and the City retaliated against them for engaging in such protected conduct. Ms. Romero brought an additional claim under the NMHRA, alleging that the City discriminated against her because of her disability—Post Traumatic Stress Disorder (PTSD)—and retaliated against her for engaging in a protected activity. We begin by addressing Ms. Dyer's and Ms. Abernathy's appeal before turning to the City's cross-appeal.

**DISCUSSION**

**I.     Ms. Dyer's and Ms. Abernathy's Appeal**

**{4}**     Plaintiffs brought this action under the WPA claiming they experienced retaliation after voicing concerns about the operation of the SCU. On appeal, Plaintiffs argue that the district court erred by finding in favor of the City on their WPA claims because, they

assert, it applied an incorrect standard of law in determining that they were not engaged in a protected activity under the WPA and that it also failed to consider their claims of a hostile work environment as a form of retaliation under the WPA. We address each of Plaintiffs' arguments in turn and ultimately affirm.

**{5}** We begin by addressing Plaintiffs' argument that the district court applied an incorrect standard of law in concluding that they were not engaged in a protected activity under the WPA. Specifically, Plaintiffs contend that this Court's holding in *Lerma v. State*, clarifies that a plaintiff asserting a claim under the WPA "is not required to prove that [their] communication pertains to a matter of public concern or that the communication benefits the public." 2024-NMCA-011, ¶ 25, 541 P.3d 151, *cert. granted* (S-1-SC-40126, Dec. 28, 2023).

**{6}** Here, the district court found that Plaintiffs both failed to prove the first element of a WPA claim—that they were engaged in a protected activity. The district court concluded that Plaintiffs each failed to prove they had a good faith belief that the City had engaged in unlawful or improper action or that such action was imminent—it went on to conclude that their complaints related to their personal work conditions or their personal disagreements with the City's legitimate managerial decisions.

**{7}** In order to have established a violation of the WPA, Ms. Dyer and Ms. Abernathy were required to prove: (1) she engaged in an activity protected by the WPA; (2) the City took an adverse action against her; (3) the adverse action was retaliatory in that her engagement in the protected activity was a cause of the adverse action; and (4) such violation of the WPA by the City was a cause of her damages. UJI 13-2321 NMRA; *see* §§ 10-16C-1 to -6.

**{8}** We agree with Plaintiffs that the district court erred insofar as it concluded that because their complaints related to private interests, they were not engaged in a protected activity. The WPA prohibits public employers from, among other things, "tak[ing] any retaliatory action against a public employee because the public employee . . . communicates to the public employer or a third party . . . about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act." Section 10-16C-3(A). The WPA defines "unlawful or improper act" as "a practice, procedure, action or failure to act on the part of a public employer: (1) violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state; (2) constitutes malfeasance in public office; or (3) constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public." Section 10-16C-2(E). As this Court recently acknowledged in *Lerma*, there is simply no language within the WPA requiring "that [a] communication pertain to a matter of public concern or benefit the public" rather than a private interest. 2024-NMCA-011, ¶ 11.

**{9}** Next, we turn to Plaintiffs' assertion that the district court erred because it failed to consider their claims of hostile work environment as a form of retaliation under the WPA. Based on our review of the record, it is clear that the district court both

considered and rejected Plaintiffs' hostile work environment claims in its capacity as finder of fact.

**{10}** Although the district court found that Plaintiffs were not engaged in acts protected under the WPA, it went on to determine whether the City took any adverse action against them. Plaintiffs submitted proposed findings of fact and conclusions of law asserting that the City took adverse actions against them by subjecting them to a hostile work environment. In its final order, the district court did not adopt Plaintiffs' requested findings related to hostile work environment; instead, it found that Plaintiffs failed to prove that the City took *any* adverse action against them. In fact, the district court found that each action alleged by Plaintiffs as retaliatory, "either did not impose a tangible, significant, harmful change in the conditions of employment, or was taken for nonretaliatory business reasons." "It is well-established that a district court's failure to make a specific requested finding of fact constitutes a finding against the requesting party." *Gabriele v. Gabriele*, 2018-NMCA-042, ¶ 31, 421 P.3d 828. Accordingly, we cannot say the district court failed to consider Plaintiffs' retaliation claims based on hostile work environment, and so we discern no error.

**{11}** Apart from Plaintiffs' assertion that the district court failed to consider its hostile work environment claims, which we've determined is incorrect, Plaintiffs make no legal argument demonstrating that the district court erred in concluding that they were not subject to any adverse employment actions, a required element of a WPA claim. *See* UJI 13-2321; *see also Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them."). Therefore, even considering that the district court applied an incorrect standard of law to determine whether Plaintiffs engaged in a protected activity, we cannot say the district court erred by ultimately finding in favor of the City. Accordingly, we affirm.

## II. Ms. Romero's Cross-Appeal

**{12}** Ms. Romero brought a claim under the NMHRA alleging, in relevant part, that the City discriminated against her "in the terms, conditions and privileges of her employment" by failing to accommodate her disability, PTSD, and retaliated against her for opposing the City's discriminatory conduct.

**{13}** On cross-appeal, the City argues that the district court erred in finding that it violated Ms. Romero's rights under the NMHRA for several reasons. The City asserts: (1) Ms. Romero failed to exhaust her administrative remedies; (2) Ms. Romero failed to present sufficient evidence to establish a claim for discrimination; (3) the district court erred in concluding that the City retaliated against Ms. Romero after she filed her charge of discrimination; and (4) the district court's damages award was improper, unsupported by the evidence and excessive. We provide a factual background and then address each of the City's arguments in turn.

**{14}** Ms. Romero began her employment with APD in 2002 and was promoted to detective in the APD Violent Crimes Division in 2003. She then moved to the SCU in 2009. In October 2016, Ms. Romero experienced a "trigger" during a reality based training (RBT) in which she was expected to shoot and kill a male suspect. During the training, Ms. Romero hyperventilated. There was no therapist on scene during the RBT to address the "trigger" Ms. Romero experienced. No one in her chain of command referred her to behavioral health services at that time.

**{15}** APD's RBT is mandatory and the training is pass/fail. If an officer fails training, APD provides remedial training and runs the scenario again. If an officer fails on the second try, "APD should provide additional remedial training and run the officer through the [training] scenario one last time." After Ms. Romero failed the first RBT, she did not receive remedial training, she was not asked to retest, nor was her failure reported to the Professional Accountability Bureau.

**{16}** In August 2017, Ms. Romero sought counseling from the Public Safety Psychology Group and was diagnosed with PTSD resulting from job-related trauma while working for APD. After her diagnosis, on October 20, 2017, Ms. Romero experienced another "trigger" during a separate RBT. Following this, Ms. Romero experienced acute symptoms, including stress, flashbacks, crying at work and home, and severe anxiety, all of which made managing job-related stress very difficult because she could not sleep.

**{17}** In the fall of 2017, Ms. Romero told her sergeant that she was seeing a counselor for job-related PTSD. From October 20, 2017 to November 3, 2017, an APD instructor (the instructor) at the police academy who oversaw all RBT, repeatedly asked Ms. Romero to provide a doctor's note stating that she could not complete RBT. During this time, Ms. Romero was under the belief that her sergeant and the instructor required that she release her therapy notes. Ms. Romero refused to do so because she was worried that she would be referred for a fitness for duty evaluation or that information about her mental health would be spread through the department. The instructor told Ms. Romero that he needed a doctor's note excusing her from RBT by November 8, 2017, or he would have to inform his chain of command. Ms. Romero replied, "Do what you have to do."

**{18}** In November 2017, Ms. Romero took leave under the Family and Medical Leave Act because of job-related trauma. Around that time, the instructor wrote a memo to the head of the Professional Accountability Bureau stating that he had tried to obtain documentation validating Ms. Romero's claim that her disability prevented her from participating in RBT for six months.

**{19}** In December 2017, Ms. Romero's therapist sent a letter to APD explaining that Ms. Romero was receiving therapy that started after her last RBT and that she regularly attended sessions and actively participated in treatment. Also in the letter, Ms. Romero's therapist stated that they had determined that Ms. Romero was able to return

to duty in a "light duty" capacity and that this determination would be reassessed every three to four weeks.

**{20}**   As a result of the therapist's letter, APD placed Ms. Romero on light duty in January 2018. She was sent an interoffice memo detailing her restricted duty status. The letter stated that Ms. Romero's badge and weapon use would be restricted until she was released to full duty status. Specifically, Ms. Romero was "directed not to display or present [her] badge and department issued gun on or off duty unless it is a deadly force situation, which requires . . . immediate action." Moreover, the letter stated that Ms. Romero would be assisted by the bureau deputy chief to arrange for an unmarked vehicle. Ms. Romero signed the letter.

**{21}**   In March 2018, Ms. Romero's therapist wrote a second letter to APD to notify them that she was still attending regular therapy sessions and she should remain on light duty. The letter also stated that this determination would continue to be reassessed every four weeks.

**{22}**   At some point, Ms. Romero's sergeant witnessed her disobeying the restricted duty requirement of keeping her badge and gun concealed and pulled Ms. Romero aside to speak to her about it. During the conversation, they had a disagreement about whether Ms. Romero was allowed to go to the gun range. The sergeant claimed that Ms. Romero became overly emotional, raised her voice and slammed her office door. The sergeant admitted that she raised her voice as well toward Ms. Romero.

**{23}**   The sergeant drafted a memo in March of 2018 detailing her interactions with Ms. Romero and it was sent to the director of human resources with the City (the Director). In the memo, the sergeant requested that Ms. Romero be "evaluated for . . . '[f]it[ness] for [d]uty' to ensure her safety and the safety of those she works with on a daily basis."

**{24}**   That same month, the interim chief of police sent a memo to the Director requesting an in-service examination for fitness for duty citing Ms. Romero's "[r]epeated emotional breakdowns at work." Ms. Romero was placed on administrative leave, and during her time on leave Ms. Romero was supposed to be paid; she was to remain available to the interim chief of police Monday through Friday; and all department property, including her badge, ID card, police vehicle, and firearms had to be surrendered.

**{25}**   Ms. Romero was scheduled for a fitness for duty evaluation with Dr. Foote on May 14 and 15, 2018. Ms. Romero attended the evaluation. In June 2018, Dr. Foote submitted his evaluation of Ms. Romero's fitness for duty finding that she was *temporarily* unfit for duty and that further counseling was mandatory. Then on July 3, 2018, the Director sent a memo to the interim chief of police quoting Dr. Foote's findings on Ms. Romero's fitness for duty evaluation. One month later, Ms. Romero "applied for worker's compensation based on her PTSD diagnosis."

**{26}**　Six months after Dr. Foote's fitness for duty evaluation, the Director sent Ms. Romero a letter informing her about Dr. Foote's findings and stating that she was scheduled for a follow-up appointment on December 18, 2018—Ms. Romero attended the evaluation. Dr. Foote submitted his follow-up report on December 20, 2018—in the report he determined that Ms. Romero had improved but she was still not ready to return to work, and that he would conduct an additional evaluation after three months of Ms. Romero continuing her weekly session with her therapist. The Director then sent a memo to the interim chief of police regarding Dr. Foote's follow-up evaluation.

**{27}**　On February 5, 2019, Ms. Romero was sent an email from the City stating that as of February 2, 2019, she was no longer on administrative leave, but instead was on injury leave because she was placed off duty by the Employee Health Center as a result of her workers' compensation claim. "At some point, [Ms.] Romero was released from workers' compensation care and [she] asked for PERA disability paperwork to be filed." Ms. Romero was approved for one year of disability retirement pension on December 6, 2019. "Thereafter, the City filled out a [r]etirement [c]hecklist and [Ms.] Romero announced her retirement effective January 1, 2020."

## A.　Failure to Exhaust Administrative Remedies

**{28}**　As an initial matter, the City argues that Ms. Romero failed to exhaust her administrative remedies regarding her discrimination claim. According to the City, Ms. Romero's charge of discrimination did not include facts alleging that she was denied a reasonable accommodation nor that she made a request for an accommodation in the first place. Ms. Romero responds that the charge of discrimination can be read reasonably to request an accommodation. We agree with Ms. Romero.

**{29}**　Before a plaintiff may state a valid claim pursuant to NMHRA, they must first exhaust their administrative remedies. *Lobato v. N.M. Env't Dep't*, 2012-NMSC-002, ¶ 10, 267 P.3d 65. NMHRA grievance procedure requires that "[a] person claiming to be aggrieved by an unlawful discriminatory practice . . . may file with the human rights division of the labor department a written complaint that shall state the name and address of the person alleged to have engaged in the discriminatory practice, all information relating to the discriminatory practice and any other information that may be required by the commission." Section 28-1-10(A). An "employee's communications to the employer must sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Ocana v. Am. Furniture*, 2004-NMSC-018, ¶ 35, 135 N.M. 539, 91 P.3d 58 (alteration, internal quotation marks, and citation omitted).

**{30}**　The City raised exhaustion of administrative remedies to the district court in its motion to reconsider and the district court denied the motion. First, regarding Ms. Romero's request for an accommodation, the district court "liberally constru[ed]" the portion of the charge reading, "In August 2017, I informed [my sergeant] about my disability. I was placed on restrictions in January 2018" as Ms. Romero requesting an accommodation. As to the City's failure to accommodate, the district court relied on the

portion of the charge reading, "In March 2018, I was subjected differently by [my sergeant] to include . . . not [being] allowed to qualify with my service weapon." The court found that these allegations "can be reasonably construed as pertaining to the reasonableness of the accommodation."

**{31}**    Here, Ms. Romero filed her charge of discrimination with the New Mexico Department of Workforce Solutions, Human Rights Bureau on May 21, 2018. She identified the time period for the discrimination as taking place sometime between August 1, 2017 and March 19, 2018. In the charge of discrimination, Ms. Romero stated that she informed her sergeant about her disability and thereafter she was treated differently—specifically, Ms. Romero stated she was placed on restrictions and not permitted to qualify with her service weapon. Ms. Romero received a letter of nondetermination from the New Mexico Human Rights Commission on July 1, 2020.

**{32}**    Although Ms. Romero did not specifically state that she requested an accommodation and that such accommodation was denied, the City was on notice that Ms. Romero disclosed her disability and was thereafter restricted in the performance of her job duties. *See Ocana*, 2004-NMSC-018, ¶ 35 (stating that "at the very least, if the statement does not mention a specific act of discrimination, the employer must be able to discern from the context of the statement that the employee opposes an allegedly unlawful employment practice" (alteration, internal quotation marks, and citation omitted)).

**{33}**    Beyond merely asserting that Ms. Romero's charge of discrimination "did not contain facts concerning the claims . . . she was allowed to assert[] at trial," that the City failed to develop a legal argument demonstrating that Ms. Romero's recitation of the facts was insufficient under the circumstances to apprise it of her discrimination claim. *See Muse v. Muse*, 2009-NMCA-003, ¶ 51, 145 N.M. 451, 200 P.3d 104 (stating that "[t]he mere assertions and arguments of counsel are not evidence"); *see also Lee v. Lee* (*In re Adoption of Doe*), 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (explaining that "where arguments in briefs are unsupported by cited authority," we presume counsel was unable to find supporting authority, we will not research authority for counsel, and will not review issues unsupported by authority). We therefore conclude that Ms. Romero exhausted her administrative remedies in relation to her discrimination claim.

## B.    Discrimination

**{34}**    The City next argues, relying on *Kitchell v. Public Service Co. of New Mexico*, that Ms. Romero did not and could not establish that she was "otherwise qualified" to perform the job duties of a detective. *See* 1998-NMSC-051, ¶ 7, 126 N.M. 525, 972 P.2d 344 (internal quotation marks and citation omitted). According to the City, Ms. Romero admitted she was not "otherwise qualified" when she applied for and accepted disability benefits, and again when she confirmed at trial that she applied for disability retirement because she was unable to perform her job duties. Ms. Romero responds that the City's interpretation of *Kitchell* is strained—however she fails to address the

City's arguments concerning both her application for disability retirement and her subsequent admission during trial. We agree with the City.

**{35}** The district court found in favor of Ms. Romero's discrimination claim, concluding, in relevant part, that "[a]bsent the disability, [Ms.] Romero was otherwise qualified for her work as a detective for the SCU with reasonable accommodation." In its motion to reconsider, the City argued in part, that Ms. Romero was not otherwise qualified because of her application for disability retirement. The district court declined to address the City's argument regarding Ms. Romero's application for disability retirement and subsequent admission during trial, referencing the City's failure to cite to the relevant portion of the transcript of Ms. Romero's trial testimony.

**{36}** Upon review of the record, we agree with the City that Ms. Romero conceded she was unable to perform the essential duties of her job with or without an accommodation. Pursuant to the NMHRA, it is unlawful discriminatory conduct for an employer "to discriminate in matters of compensation, terms, conditions or privileges of employment against any person *otherwise qualified* because of . . . physical or mental disability [or] serious medical condition." Section 28-1-7(A) (emphasis added). Our Supreme Court has defined the term "otherwise qualified" to refer "to a person who, though affected by a handicap or medical condition, maintains the underlying ability to do the job." *Kitchell*, 1998-NMSC-051, ¶ 6 (internal quotation marks omitted).

**{37}** Here, Ms. Romero applied for disability retirement pension and her application was approved. In order for Ms. Romero to have qualified for disability retirement benefits, it must have been determined that she was "mentally or physically totally incapacitated for continued employment with an affiliated public employer" and that such "incapacity is likely to be permanent." NMSA 1978, § 10-11-10.1(C)(1) (2013). To reiterate, during trial Ms. Romero confirmed that she applied for disability retirement pension and she did so because she was unable to perform her job duties due to her PTSD.

**{38}** We agree with Ms. Romero's assertion that "employers have an affirmative obligation to make reasonable accommodation for a disability," but her briefing fails to acknowledge both her application for disability retirement pension as well as her admission during trial that her PTSD rendered her unable to return to work. She raises no argument that her application for disability retirement is unlike the plaintiff's application for workers' compensation in *Kitchell*. In *Kitchell* our Supreme Court concluded that a plaintiff admitted he was not "otherwise qualified" because he admitted in his workers' compensation claim that his injury prevented him from "engaging, for remuneration or profit, in any occupation for which he is or becomes fitted by age, training, or experience." 1998-NMSC-051, ¶ 7 (internal quotation marks and citation omitted). Here, Ms. Romero made an admission that her disability prevented her from pursuing continued employment, just as the plaintiff did in *Kitchell. See id.*

**{39}** Finally, Ms. Romero cites no evidence in her briefing to this Court establishing that she was "otherwise qualified" for her position. Accordingly, we conclude that Ms.

Romero failed to establish that she was "otherwise qualified" for her employment as is required for a disability discrimination claim under the NMHRA. The district court erred in concluding otherwise.[1]

## C.      Retaliation

**{40}**    The City next argues that the district court erred in concluding that it retaliated against Ms. Romero after she filed her charge of discrimination. Specifically, the City asserts that the district court erred in concluding that it took adverse action against Ms. Romero by not reasonably accommodating her; failing to provide her with options necessary to return to work; and that Ms. Romero's engagement in a protected activity was a motivating factor in failing to bring her back to work or provide her with options and a path for doing so. We again agree with the City.

**{41}**    "The NMHRA makes it unlawful for any person or employer to retaliate against any person who has opposed any unlawful discriminatory practice." *Ocana*, 2004-NMSC-018, ¶ 35 (internal quotation marks and citation omitted); *see* § 28-1-7(I)(2). To prove that the City retaliated against Ms. Romero in violation of the NMHRA, she had to show: "(1) she engaged in [a] protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between these two events." *See Ocana*, 2004-NMSC-018, ¶ 33. The City does not dispute that Ms. Romero engaged in a protected activity. Accordingly, we are only concerned with the second and third elements for retaliation claims as discussed in *Ocana*. *See id.*

**{42}**    The City's retaliation, as alleged by Ms. Romero, is that it "engaged in reprisal and/or further discrimination against [her] for opposing . . . unlawful discrimination." According to Ms. Romero, the actions the City took in attempting to accommodate her were retaliatory in nature. On appeal, she points to her sergeant's demand that she sign a mental health medical release to provide "therapy notes" to her chain of command, being referred by her chain of command for a fitness for duty evaluation, the City withholding Dr. Foote's evaluations from her after the evaluation, and her sergeant's aggressive and humiliating demeanor towards her in the work place.

**{43}**    Our Supreme Court has held that "[a]n adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment." *Ulibarri v. N.M. Corr. Acad.*, 2006-NMSC-009, ¶ 16, 139 N.M. 193, 131 P.3d 43. Examples of such a change include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, [and] a decision causing a significant change in benefits." *Id.* (internal quotation marks and citation omitted). Even if we were to assume that the above-mentioned actions that Ms. Romero points to constitute adverse employment actions, there is simply no basis to conclude that they were motivated by any retaliatory intent on the City's part.

---

[1]Because we conclude that Ms. Romero admitted she was not "otherwise qualified" we do not reach the City's argument that the district court erred in concluding Ms. Romero was subject to an adverse employment action.

**{44}** Here, it is undisputed that Ms. Romero could not complete the mandatory RBT training and that the City merely sought documentation from Ms. Romero excusing her participation in such mandatory training. Moreover, it is undisputed that Ms. Romero's referral for a fitness for duty evaluation was due to her repeated emotional outbursts in the workplace and her disobeying restricted duty requirements.

**{45}** Regarding the City's failure to provide Ms. Romero with information necessary for her return to work, it is unclear how inaction on the City's part was motivated by any retaliatory intent because it was determined by Dr. Foote that Ms. Romero was temporarily unfit for duty and that she required further counseling before returning to work. Dr. Foote made no determination that Ms. Romero could return to work under any sort of modified working conditions. Additionally, as discussed in the previous section, Ms. Romero had filed for disability retirement and sought not to return to work given her inability to perform the duties of her job. In doing so, she had to prove that she was "mentally or physically totally incapacitated for continued employment with an affiliated public employer." Section 10-11-10.1(C)(1)(a).

**{46}** Finally, Ms. Romero fails to develop any legal argument explaining how her sergeant's behavior towards her was motivated by retaliatory intent rather than simply the sergeant's response to Ms. Romero repeatedly failing to comply with the "light duty" requirements—after all, Ms. Romero's light duty status was an accommodation requested by her own therapist.

**{47}** Based on the record before us, we conclude that there was insufficient evidence to support the district court's determination that the City retaliated against Ms. Romero. Rather, it is clear from the record that the City made multiple attempts to accommodate Ms. Romero's PTSD.

**{48}** For these reasons, we reverse the district court's determination in favor of Ms. Romero on her claims of discrimination and retaliation.

## D.    Damages Award

**{49}** Because we reverse on both claims, we need not reach the City's damages argument.

## CONCLUSION

**{50}** For the foregoing reasons, we affirm in part and reverse in part.

**{51}**   **IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**GERALD E. BACA, Judge**